**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 12-1844 and 12-1845
_____

JOSEPHAT HENRY; SYLVIA BROWNE; MAUDE DREW; MARTHA ACOSTA;
WILHELMINA GLASGOW; MERCEDES ROSA; AMADO RODRIGUEZ;
GEORGE RODRIGUEZ; SONYA CIRILO; NEFTALI CAMACHO,
as Class Representatives,

Appellants in Case No.: 12-1844

v.

ST CROIX ALUMINA, LLC; ALCOA, INC.; GLENCORE, LTD, f/k/a Clarendon, Ltd.


JOSEPHAT HENRY; SYLVIA BROWNE; MAUDE DREW; MARTHA ACOSTA;
WILHELMINA GLASGOW; MERCEDES ROSA; AMADO RODRIGUEZ;
GEORGE RODRIGUEZ; SONYA CIRILO; NEFTALI CAMACHO,
as Class Representatives

v.

ST. CROIX ALUMINA, LLC; ALCOA, INC; GLENCORE, LTD, f/ka Clarendon, Ltd.

LEE J. ROHN, ESQ.,

Appellant in Case No.: 12-1845

On Appeal from the United States District Court
of the Virgin Islands – Appellate Division
(District Court No.: 1-99-cv-00036)
District Court Judge:  Honorable Harvey Bartle, III

Argued May 13, 2014


Before: RENDELL, FUENTES and GREENAWAY, JR., Circuit Judges


(Opinion filed: July 10, 2014)

Rhea R. Lawrence, Esq.         **(Argued)**
Lee J. Rohn, Esq.
Lee J. Rohn & Associates
1101 King Street
Christiansted, VI 00820


Counsel for Appellants

Andrew C. Simpson, Esq.        **(Argued)**
Andrew C. Simpson Law Offices
2191 Church Street, Suite 5
Christiansted, VI 00820


Rene P. Tatro, Esq.            **(Argued)**
Juliet A. Markowitz, Esq.
Tatro Tekosky Sadwick
333 South Grand Avenue
Suite 4270
Los Angeles, CA 90071


Richard H. Hunter, Esq.
Hunter & Cole
1138 King Street
Suite 3
Christiansted, VI 00820


Counsel for Appellees

O P I N I O N


**RENDELL**, Circuit Judge:

2

Appellants lived in the vicinity of the St. Croix Alumina Refinery Plant when, in 1998, Hurricane Georges struck the Virgin Islands. Appellants brought suit against the companies which own and operate the plant, alleging, *inter alia*, that they had negligently allowed material to escape from the plant's premises during the hurricane, causing physical harm, property damage and emotional distress. Appellants now claim that the District Court erred in excluding their four experts, and in granting summary judgment to Appellees as to certain of the claims. For the reasons set forth below, we will affirm the orders of the District Court.

## I. Background

Because we write primarily for the benefit of the parties, we recite only those facts necessary for our disposition of the case. The St. Croix Alumina Refinery Plant processes bauxite into alumina. In so doing, bauxite, a reddish ore with the consistency of dirt, is combined with caustic soda, allowing for the extraction of commercially valuable alumina. As a byproduct of the refining process, bauxite residue, also called "red mud," is created. Bauxite residue is generally indistinguishable from bauxite, in terms of color and texture, but the residue has different chemical properties. For instance, the pH of bauxite residue remains highly alkaline and is potentially harmful if contacted with skin or otherwise absorbed into the body. Bauxite, on the other hand, is generally inert.

When Hurricane Georges made landfall on St. Croix, on September 21, 1998, some ten thousand metric tons of bauxite awaited processing in the plant in a "large, A-frame structure roofed by steel paneling." (App. 182.) More "red mud," or bauxite

3

residue, was "dry-stacked" in "seven enormous, uncovered 'cells' around the refinery." (App. 182.) Strong winds from Georges hit the area near the refinery, causing portions of the bauxite shed roof to shear off.

Following the storm, the Virgin Islands Department of Natural Resources ("DPNR") and the Environmental Protection Agency ("EPA") received reports from residents that their properties were contaminated with a reddish dust. The only contemporaneous, direct testing of the red material was conducted by the EPA/DPNR shortly after the storm, which found that "the red dust [deposited in the neighborhoods surrounding the refinery] is in fact bauxite." (App. 183.)

Appellants allegedly sustained mild illnesses/injuries as a result of contact with the red dust during and after the hurricane. Generally, Appellants experienced rashes, irritation of the eyes and skin, and itching. All but one of the seventeen Appellants had their symptoms disappear completely in the weeks and months following the hurricane.[1]

Appellants filed suit against certain companies associated with the refinery plant. Following years of protracted litigation, in 2009 the District Court granted summary judgment to Appellees on all personal injury claims, for failure to establish causation. However, the District Court denied summary judgment as to Appellants' claims of property damage, finding sufficient evidence that Appellees were engaged in an abnormally dangerous activity and had caused property damage. The parties settled all property damage claims through a formal release, and preserved the dismissed claims for

---

[1] As noted by the District Court, the sole outstanding injury is alleged scarring on one of Appellant's legs that arose several months after the hurricane.

appeal.

The dismissal of Appellants' personal injury claims was founded in large part on the Court's previous rejection of their four proposed experts. Three of the experts, Jim Tarr, Clayton Bock, and Edward Kleppinger, are engineers or scientists who were to provide reports and testimony on the issue of what material Appellants were exposed to, the amount, and the danger posed by that exposure. The fourth expert, Dr. Nacham Brautbar, is a medical doctor who provided reports and testimony as to the diagnosis of Appellants' various maladies. The District Court held that the four experts, insofar as they proposed to testify on the above issues, did not satisfy the requirements of Fed. R. Evid. 702 and the accompanying test enunciated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Without any expert testimony as to the cause of Appellants' injuries, the District Court ruled that the personal injury claims could not proceed and granted summary judgment to Appellees on those counts.

## II. Standard of Review[2]

"Under the deferential abuse of discretion standard, we will not disturb a district court's decision to exclude testimony unless we are left with 'a definite and firm conviction that the court below committed a clear error of judgment.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (quoting *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999)). Conclusions of law, mixed questions of law and fact, and summary judgment orders are reviewed *de novo*. We employ the same standard as the District

---

[2] The District Court had jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

5

Court pursuant to Fed. R. Civ. P. 56(a), that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

## III. Discussion

Appellants raise several claims before us. First, that the District Court erred in its decision to exclude the testimony of Appellants' four proposed experts. Second, that expert testimony was not needed to establish the cause of their injuries, so that summary judgment should not have been granted. Third, that Appellants can recover for emotional distress even without a showing of physical injury. Fourth and finally, that the District Court erred in dismissing the punitive damages count. We address these arguments in turn.

### A. Expert Testimony

### 1. Ruling of District Court

In general, expert testimony must meet specific requirements, pursuant to Fed. R. Evid. 702, to be admissible: (1) the witness must be sufficiently qualified, (2) the testimony must be reliable, and (3) the testimony must assist the trier of fact, in other words, it must be relevant and "fit" the facts of the case. We have repeatedly approved the use of so-called *Daubert* factors as useful, though non-exclusive tools for determining the reliability of expert testimony:

> A trial court should consider several factors in evaluating whether a particular methodology is reliable. These factors . . . may include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is

6

generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48 (3d Cir. 2008).

In its opinion rejecting Appellants' proposed expert testimony, the District Court noted that Appellants were offering "expert testimony that the most likely cause of their claimed injuries was exposure to a strong base, namely, red mud."[3] (App. 184.) In that light, the Court evaluated the proposed testimony of each of Appellants' experts as to whether they had "good grounds" for reaching their conclusions, and whether the proffered opinions were relevant to the case. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994).

Tarr, Bock and Kleppinger each opined on the amount of red mud that escaped the refinery and reached Appellants. Tarr concluded that some 160,000 pounds of particulates escaped from the refinery, and Bock and Kleppinger each stated that red mud was a "preponderance" or large component of the red dust that contacted Appellants. (App. 189, 191, 194.) However, as the District Court noted, each of the experts relied

_____

[3] Appellants argue on appeal that, in addition to red mud, bauxite itself could also cause the alleged injuries. We find no error in the District Court's focus solely on the bauxite residue as the alleged cause, as that was the focus of much of the expert reports and testimony. For instance, Tarr's September 22, 2003 expert report is titled: "An Analysis of the Impact of 'Red Mud' Emissions from the Saint Croix Alumina Facility Caused by Hurricane Georges." (App. 6045.) Similarly, Bock conducted an experiment in which he blew *solely* red mud into a room to determine the effectiveness of remediation efforts. (App. 6964.) Finally, while Dr. Brautbar vaguely alluded to bauxite as a potential cause of appellants' injuries, he stated his final conclusion thus: "[i]n my opinion, the caustic, pH-dependent mechanism of the red mud caused and/or significantly contributed to causing the following medical conditions and symptoms of the following plaintiffs . . . ." (App. 5134.)

7

upon unique, qualitative methodologies to reach these conclusions.[4] The District Court properly found that none of these methods had any of the hallmarks of reliable expert testimony under *Daubert*. The experts did not utilize a peer-reviewed methodology, subject to any known rate of error, which is generally accepted in the scientific community, or has otherwise been utilized outside the judicial context. While these factors are, of course, non-exclusive, the District Court correctly found that, overall, the expert testimony offered by Tarr, Bock and Kleppinger on this issue was not reliable.

Much of the remaining opinions submitted by these experts was then excluded by the District Court as it did not "fit" with the case. For instance, Kleppinger and Bock testified as to the pH and toxicity of red mud stored at the refinery. The District Court held that this did not bear on the danger posed by the material that actually came into contact with Appellants.[5] Critically, as the Court pointed out, Appellants offered *no* reliable testimony as to the amount and toxicity of the red dust which came into contact with Appellants.

Finally, the District Court found Dr. Brautbar's testimony inadmissible, as it relied on the excluded expert opinions to establish that Appellants had come into contact with

---

[4] In addition, Tarr stated that his 160,000 pounds figure, "isn't an estimate or an emission rate that you would want to take to the bank" and "is not the kind of number that [he] would typically include in a report like this." (App. 189.) Kleppinger testified that his opinion that red mud constituted a "preponderance" of the red dust was a "simple, back-of-the-envelope kind[] of thing . . . ." (App. 194.)

[5] The District Court included in a thoughtful footnote that if Bock's testimony as to the pH of the red mud stored at the refinery "provided a necessary foundation for the testimony of another expert who could reliably estimate the pH of the deposited material, we would have a different case under Rule 702. Plaintiffs have offered no such expert." (App. 192-93 n.4.)

8

sufficient quantities of red mud to cause their claimed symptoms. In sum, the District Court performed an exhaustive and able analysis of the proposed expert testimony, and determined that it was inadmissible. We agree with the reasoning and conclusions of the District Court, and affirm its evidentiary rulings.

2. *Daubert* Hearing

Appellants separately argue that it was reversible error to exclude expert testimony without holding a *Daubert* hearing. In support, Appellants cite *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999), noting that we have "long stressed the importance of in limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and *Daubert*."

However, just a few sentences later, we stated "[a]n in limine hearing will obviously not be required whenever a *Daubert* objection is raised to a proffer of expert evidence. Whether to hold one rests in the sound discretion of the district court." *Id.* at 418. Following *Padillas*, we have found that a hearing is not required where the District Court is presented with a full record. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (finding that, "the district court already had before it the depositions and affidavits of the plaintiff's experts. Nothing more was required.").

The record in this case is immense and was entirely before the District Court when it ruled on the expert testimony. Appellants do not explain how a hearing would have benefited them, except to say that the Court should have given the "experts an opportunity to address its concerns." (Appellants' Br. at 46.) As such, it is unclear what, if anything, an *in limine* hearing could have added to the Court's analysis. We

9

accordingly conclude that the District Court properly acted within its discretion in declining to hold a *Daubert* hearing *sua sponte*. *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (upholding the exclusion of expert's testimony, even when no hearing had been held).

3. Exclusion *In Toto*

Appellants briefly argue that the District Court erred by excluding the experts' testimony *in toto* rather than only specific objectionable parts. "Under *Daubert,* a District Court must review an expert's testimony to determine whether it may proceed to the factfinder . . . . *Daubert* is not an all-or-nothing test, however—a District Court can independently consider whether each 'particular scientific [or technical] methodology is reliable.'" *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189 n.18 (3d Cir. 2012) (quoting *Elcock v. Kmart Corp.,* 233 F.3d 734, 745 (3d Cir. 2000)).

We find, contrary to Appellants' suggestion, that the District Court did not reflexively exclude the proffered expert evidence *in toto*. It followed a model approach of considering the admissibility of each significant proffered opinion. And despite additional briefing before us, Appellants have not identified opinion evidence which would have been admissible to show causation. In sum, we find that the District Court carefully examined the various opinions offered by Appellants' experts and properly determined they were either unreliable or did not "fit" with the case. We thus find that the District Court committed no error in excluding the proposed expert testimony.[6]

_____

[6] It should also be noted that the District Court did not exclude all of Appellants' expert testimony. Rather, in its summary judgment opinion, the Court specifically held

10

B.  Necessity of Expert Testimony

Appellants next argue that, in any event, they do not need experts to prove "that the Refinery's industrial waste caused eye, skin, and respiratory irritation." (Appellants' Br. at 63.)  Rather, Appellants urge that because the medical conditions were "obvious or common in everyday life . . . expert opinion may not be necessary as to causation . . . if the plaintiff's evidence creates a probability so strong that a lay jury can form a reasonable belief." (Appellants' Br. at 63.)

None of the cases cited by Appellants in support of this proposition overcome the general requirement of expert testimony on causation in a complex, toxic tort case.  *See Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 852 (3d Cir. 1995) ("[When] the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson . . . the law requires that expert medical testimony be employed.") (quoting *Gradel v. Inouye,* 491 Pa. 534, 421 A.2d 674, 679 (1980)).  A jury could not simply intuit what caused Appellants' varying injuries here, and without expert testimony to assist them, the personal injury claims could not proceed.  We therefore reject Appellants' argument and objection to summary judgment on this ground.

C.  Emotional Distress Without Physical Injury

Appellants next urge that the District Court erred in rejecting their claims of emotional distress/mental anguish on the grounds that they had not shown any personal

---

admissible Kleppinger's testimony regarding the proper standard of care of red mud and bauxite, as well as Appellees' nonconformance to that standard, for purposes of Appellants' property damage claims.

injuries. Specifically, Appellants argue that under the Restatement (Second) of Torts, they need not show any physical harm in order to recover.

Appellants primarily rely upon § 929 of the Restatement (Second) of Torts (although they mistakenly cite it as § 939), which notes in Comment (e) that, "[d]iscomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests." While this section is titled "Harm to Land from Past Invasions," Appellants argue that it, along with certain other sections of the Restatement, provide a general cause of action for emotional distress, independent of any requirement of personal injury.

We agree with Appellees that this argument has been waived, as it was not raised at the District Court. At summary judgment, Appellants never advanced the argument that physical injuries were not required to make out an emotional distress claim, nor that their proposed expert testimony was completely unnecessary, since they needed to only show that they experienced some form of emotional distress as a result of their property damage. We will not entertain this argument for the first time on appeal. *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 415-16 (3d Cir. 2011).

Even if not waived, it would appear that this line of argument is barred by the Settlement Agreement releasing "all real and personal property damage claims that have been or could have been asserted in the litigation with the exception of any diminution of value claim that is reinstated in the appeal . . . ." (App. 110.) § 929, "Harm to Land from Past Invasions," does not itself provide a cause of action but rather elucidates the

12

remedies available for harm to one's property, which include damages for "discomfort and annoyance." It would seem that emotional distress, resulting from harm to property, would be properly recognized as a property damage claim. Appellants have released any such claim in their settlement and are precluded from raising them here.

D. Punitive Damages

Finally, Appellants conclude by urging that they presented sufficient evidence to recover punitive damages. They contend that the evidence of record shows reckless conduct, creating an unreasonable risk of physical harm to others. This evidence includes: (1) failure to take additional precautions to protect local residents, (2) failure to take precautions to prevent fugitive omissions, such as use of a tarp or hurricane-proof storage facility, (3) failure to further study the health risks of red dust exposure, (4) failure to conduct ambient air monitoring, (5) use of only minimal efforts to control emissions, (6) failure to undertake more specific efforts to identify toxic chemicals in red mud and (7) that Appellees "faked-up studies to show that it was complying with PM emission standards necessary for permitting and defrauded the EPA." (Appellants' Br. at 69.)

We agree with the District Court that such allegations do not give rise to punitive damages. The vast majority of the "evidence" cited by Appellants involves the failure of Appellees to take further, unspecified action to protect the local residents. The vague allegations of Appellants, in short, do not rise to the level of "evil motive or [] reckless indifference" necessary to recover punitive damages. *See Powell v. Chi-Co's Distrib., Inc.*, No. ST-13-TOR-14, 2014 WL 1394183, at *2 (V.I. Super. April 3, 2014).

13

## IV. Conclusion

For the reasons set forth above, the judgment of the District Court is affirmed.